**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY D. MARINO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 5721** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory D. Marino brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a summary judgment motion seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a cross-motion for summary judgment seeking affirmance of the decision. After careful review of the parties' briefs and the record, the Court now denies Plaintiff's motion, grants Defendant's motion, and affirms the decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on March 27, 2009, alleging that he became disabled beginning on March 18, 2008 due to pain and limited mobility caused by a knee injury

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, and is automatically substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

and subsequent surgeries. (R. 20, 173-75). The Social Security Administration denied the application initially on August 6, 2009, and again on reconsideration on December 8, 2009. (R. 20, 88-91). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Kim Soo Nagle held a hearing on March 23, 2011, where she heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 37-87). On April 14, 2011, the ALJ found that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the regional and national economy. (R. 30-31). The Appeals Council denied Plaintiff's request for review on May 22, 2012. (R. 1-5).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In his brief, Plaintiff argues that the ALJ erred in four respects: (1) failing to consider certain severe impairments at Step 2 of the analysis; (2) mischaracterizing and failing to give controlling weight to the opinion of treating physician Dr. Branovacki; (3) finding Plaintiff only partially credible; and (4) not finding Plaintiff's RFC to be more restricted as to his physical limitations concerning lifting, repetitive motions, and standing, as well as his non-exertional and mental limitations.

## **FACTUAL BACKGROUND**

Plaintiff was born on June 18, 1965 and was 42 years old on his alleged disability onset date. (R. 30). He completed two years of college. (R. 30, 197). Plaintiff worked as a tractor-trailer truck driver from the time he completed truck driving school in 1994 until he was injured on the job in March 2008. (R. 30, 190, 197). His job consisted of driving and unloading trucks; breaking down, separating, and picking up loads; heavy lifting and placing of loads onto docks or pallets; and breaking down boxes. (R. 190).

### A.    Plaintiff's Medical History

### 1.    Right Knee Injury

Plaintiff states in his application for benefits that he was injured at work on March 18, 2008. (R. 189). The earliest documentation in the case record is an MRI of Plaintiff's right knee, taken on April 1, 2008, which revealed a low to mid-grade injury of the medial collateral ligament, mild irregularity of the medial meniscus, a bone contusion, joint effusion, bursitis, subluxation of the patella, mild chondromalacia of the patellofemoral joint, and mild thinning of the medial patellar retinaculum. (R. 283-84).

Three weeks later, on April 21, 2008, Plaintiff was evaluated by Dr. Ram Aribindi, MD of Southland Bone & Joint Institute, who noted that Plaintiff complained of left elbow and right knee pain after tripping over a pallet at work. (R. 460). Dr. Aribindi's physical examination of the right knee showed some tenderness over the medial joint line and over the MCL origin over the medial epicondyle region, no medial joint line opening with valgus stress to the knee, no tenderness laterally, good flexion and extension of the knee, and a negative Lachman's test. (*Id.*). Dr. Aribindi noted that the MRI revealed a sprain of the medial collateral ligament (MCL) and chondromalacia of the patella (inflammation of the kneecap). (R. 461). The doctor recommended Naproxen, home exercise, physical therapy, and modified work duties, including refraining from squatting or kneeling on the right knee. (R. 461, 472).

At a follow-up visit on May 12, 2008, Plaintiff continued to complain of pain over the anterior aspect of his right knee with prolonged sitting as well as some pain with stairs. Dr. Aribindi's examination showed no effusion, no pain with varus or valgus stress to the knee, good flexion and extension, and a negative Lachman's test. (R.

459).  Dr. Aribindi's treatment plan for the knee consisted of losing weight and keeping fit, including home exercise, and taking Naproxen intermittently as needed.  (*Id*.).  He cleared Plaintiff to return to work the next day.  (*Id*.).

Plaintiff attended four physical therapy sessions at Southland Bone & Joint Institute in late April and early May 2008, and he was discharged from physical therapy on June 2, 2008 "as [he] did not represent to therapy."  (R. 482-91).  At his last session on May 8, 2008, Plaintiff reported "doing better overall" with "mild knee discomfort."  (R. 484).

On May 18, 2008, Plaintiff was examined by Dr. George Branovacki, MD of Midwest Orthopaedic Consultants.  (R. 527).  Dr. Branovacki's exam found a normal left elbow, while the right knee showed mild effusion with pinpoint tenderness over the tibial plateau by the MCL insertion, pain with valgus stressing on the medial side of the knee, no instability of the knee, full range of motion, and ability to straight leg raise.  (*Id*.).  The doctor concluded that the elbow had recovered but that the right knee has an MCL sprain, for which he recommended rehabilitation and a knee brace.  (R. 528).  At a follow-up visit on June 9, 2008, Plaintiff continued to complain of knee tenderness, although he reported that "his pain is getting better."  (*Id*.).  He began physical therapy with Midwest Orthopaedic on June 11, 2008 and continued until August 18, 2008.  (R. 378-82).  On July 7, 2008, Plaintiff was still experiencing some pain and discomfort, for which Dr. Branovacki recommended a larger brace and continued physical therapy.  (R. 525).

However, on August 18, 2008, Dr. Branovacki recommended knee arthroscopy after six months of "failed conservative management" and an MRI that "does confirm

some small meniscus tears and some inflammation that is from an effusion and chondral injury." (R. 526). Plaintiff preferred to continue non-operative management for another month, but on September 22, 2008 he complained of knee pain such that "he can barely walk." (*Id.*). Dr. Branovacki referred Plaintiff for a left knee MRI and right knee arthroscopy, but also stated, "We can set up knee arthroscopy for both knees as well." (*Id.*).

An MRI of the right knee on September 9, 2008 showed a small bone contusion at the lateral tibia with improvement since April 2008, small joint effusion, mild degenerative changes, and abnormal signal intensity of the medial meniscus unchanged since prior examination and most likely representing degenerative fibrillation. (R. 363). An MRI of the left knee on September 28, 2008 showed small joint effusion with a small cyst, vertical tear of the junction of the posterior horn and mid body of the medial meniscus, marrow edema consistent with contusion, and a nonspecific edema. (R. 361).

At a follow-up visit on October 9, 2008, Dr. Branovacki noted that both of Plaintiff's knees "are acting up significantly," and the MRIs "confirm meniscus tears medially in both knees as well as a significant amount of knee effusion." (R. 523). Plaintiff agreed to bilateral knee arthroscopic surgery. (*Id.*).

## 2. Bilateral Knee Surgery and Post-Operative Infection

On November 14, 2008, Dr. Branovacki performed a bilateral knee arthroscopy, with bilateral chondroplasty, right medial meniscus partial medial meniscectomy, and bilateral injection of steroid to the knees. (R. 288-90). There were no complications and Plaintiff was stable post-surgery. (*Id.*).

On December 19, 2009, Plaintiff's therapist sent him to Dr. Branovacki's office due to some fluid drainage in the right knee, which was bandaged until his previously scheduled appointment with the doctor a few days later. On December 23, 2008, Plaintiff complained of pain and swelling, and Dr. Branovacki aspirated the knee and gave Plaintiff a prescription for antibiotic Keflex, which Plaintiff did not fill. (R. 294).

On December 26, 2008, Plaintiff presented to Christ Hospital Emergency Room with severe right knee pain, ongoing for several days, which prevented him from standing. (R. 292). Dr. Sampath Kumar diagnosed Plaintiff with septic (infectious) arthritis and gave him IV antibiotics and pain medication. (R. 291, 294). A culture showed Proteus, Staph Aureus, and MRSA infections. (R. 291). Arthroscopic irrigation and debridement was performed by Dr. Daniel Troy on December 27 and by Dr. Richard Lim on December 29. (R., 294, 303-07). Plaintiff was discharged on December 31, 2008 with six weeks of IV antibiotics. (R. 291, 294, 812-13).

Plaintiff continued to see Dr. Branovacki for follow-up treatment in January and February 2009 and was prescribed Flexeril and Norco during this time period. (R. 400-14, 1219-23). On February 27, 2009, Plaintiff underwent a venous Doppler ultrasound of his right arm which revealed a thrombosis of the right axillary vein caused by the placement of the PICC line which was used to deliver the IV antibiotics. (R. 429, 431). A Doppler of his right lower leg revealed no evidence of thrombosis. (R. 442). Plaintiff was admitted to Ingalls Hospital where his arm thrombosis was treated with Coumadin and Arixtra. (R. 431, 438). While at Ingalls, Plaintiff was evaluated for other ailments, including right knee pain. (R. 438-39).

### 3.    Ongoing Knee Pain

Plaintiff continued to complain of right knee pain throughout 2009, and underwent physical therapy in early 2009.  On April 3, 2009, a physical therapy progress report stated that Plaintiff experiences soreness in his left knee at a level of 4.5 out of 10 in the morning and none otherwise, and in his right knee at a level of 6.5 out of 10 in the morning and otherwise 4 or 5 out of 10.  (R. 370-72).  The report also noted that Plaintiff has continued swelling, poor balance, good strength, and can walk short distances.  (R. 372).  Over the course of June 2009, Plaintiff received five Supartz injections to his right knee, and by the second injection he had no tenderness or swelling and no change in his range of motion.  (R. 511-14).

On June 5, 2009, Plaintiff met with pain specialist Faris Abusharif, MD for an initial consultation.  (R. 645-47).  Dr. Abusharif discontinued Plaintiff's use of Norco, and started him on Ultram, Neurontin, and Voltaren gel for his knee pain.  (R. 647).  On June 9, 2009, Plaintiff met jointly with Dr. Abusharif and pain psychologist Peter Brown, Psy.D.  (R. 506-07).  Dr. Brown noted that Plaintiff "is demonstrating a high degree of discouragement or identification with the disabled role" and "believes that treatment is something that is done to him, rather than something he participate in."  (R. 506).  He further noted that Plaintiff's "coping style is difficult to treat" and recommended a two-month treatment strategy of meeting jointly with the pain physician and pain psychologist, followed by meeting with the pain psychologist only to convert the physician's instructions "into protocols with emphasis on [the] patient's role and responsibilities."  (R. 506-07).  At Plaintiff's next visit on July 22, 2009, he met with Dr.

Brown and Dr. Abusharif who reviewed an increased activity protocol with Plaintiff focused on walking.  (R. 503-04).

When he saw Dr. Branovacki on July 27, 2009, Plaintiff had ceased using narcotic pain medication and complained of right knee and back pain and left knee discomfort.  (R. 509).  Dr. Branovacki examined the right knee and noted "a normal exam with no effusion and no warmth," "good range of motion," and "tender to palpation."  (*Id.*).  He "offered [Plaintiff] a Medrol Dosepak to see if this helps him and [noted] he will be on maintenance steroids for a short time."  (*Id.*).  He also cleared Plaintiff to return to work for a trial of sedentary administrative duty.  (*Id.*).

### 4. Consulting Assessments for Benefits Application

Upon referral from Dr. Branovacki, physical therapist Amy Beckman performed a Functional Capacity Evaluation (FCE) of Plaintiff on April 22, 2009.  (R. 367-69).  Ms. Beckman concluded that Plaintiff "provided sub-maximal physical effort during testing," meaning that he "may be able to do more physically at times than was demonstrated during this testing day."  (R. 367-68).  Along similar lines, Ms. Beckman concluded that "[o]verall test findings, in combination with clinical observations, suggest considerable question be drawn as to the reliability/accuracy of [Plaintiff's] subjective reports of pain/limitation."  (R. 368, 369).  She noted that Plaintiff is not capable of resuming work as a truck driver at this time, but heart rate analysis with fitness testing indicates he can perform work at the medium physical demand level, although currently restricted to lifting no more than 5 pounds with his right arm due to his thrombosis.  (R. 368).  She further noted that the right arm restriction prevents her from determining Plaintiff's lifting

tolerance at this time.  (*Id.*).  Ms. Beckman recommended a trial of work conditioning and referral to a pain program.  (R. 369).

On July 31, 2009, Dr. Vidya Madala completed a Physical Residual Functional Capacity Assessment for the Illinois Bureau of Disability Determination Services ("DDS") based on a diagnosis of bilateral arthroscopies of the knees.  (R. 492).  She concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) at least 2 hours in an 8-hour work day, sit (with normal breaks) about 6 hours in an 8-hour work day, and is limited in his ability to push and/or pull in his lower extremities.  (R. 493).  Dr. Madala noted that Plaintiff had bilateral arthroscopy in November 2008 and right knee arthroscopy and debridement in December 2008; began physical therapy in January 2009; requires assistance with walking due to knee weakness; and "appears" to have "reached maximal benefit" as of April 30, 2009.  (*Id.*).  Due to his knee problems, she found that Plaintiff is frequently limited in balancing and stooping; occasionally limited in climbing ramps or stairs, kneeling, crouching, and crawling; and is never able to climb ladders, ropes or scaffolds.  (R. 494).  Finally, she found that Plaintiff has no manipulative, visual, communicative, or environmental limitations, except that he should avoid concentrated exposure to hazards such as machinery and heights due to his knee problems.  (R. 495-96).  Dr. Madala noted Plaintiff's complaints of pain and fatigue, including that he has severe pain in both knees that prevents him from driving a truck, walking without a cane, standing for long periods of time, doing chores around the house, lifting his legs, or lifting more than 5 pounds.  (R. 497).  She found Plaintiff's statements to be "partially credible in light of the overall evidence," but concluded that

his stated functional limitations exceed those supported by the objective medical findings. (R. 499).

On August 6, 2009, the Social Security Administration denied Plaintiff's application for benefits. (R. 88-89).

### 5. Treatment After Denial of Benefits

On September 17, 2009, pain psychologist Dr. Brown noted that Plaintiff remains on light duty at work, reported increased work tolerance (from 2-3 hours per day up to 6-7 hours per day), and continues to work four days per week. (R. 501). On September 28, 2009, Dr. Branovacki examined Plaintiff's knee and found it "fairly normal except for a lot of apprehension in trying to examine his knee and tenderness to palpation throughout the knee," but noted that the knee was not hot, there was no effusion or instability, and Plaintiff has full range of motion. (R. 510). Dr. Branovacki concluded that all he could suggest was a trial of Flector patches for the pain and continuation of chronic pain management with the pain specialist. (*Id.*). Dr. Branovacki noted that he believes Plaintiff will be at maximum medical improvement within one or two months, and that "[a]s far as I can tell he is permanently disabled with his knee…although his exam does not indicate this chronic pain, [and] sometimes manifests with a normal exam as in the case with many people with low back pain." (*Id.*).

In a report dated November 10, 2009, Dr. Abusharif noted that on October 15, 2009, Plaintiff complained of right knee pain at a level of 5 to 6 out of 10, although Plaintiff reported improvement with a combination of Neurontin and Voltaren gel. (R. 638). Dr, Abusharif concluded that Plaintiff's pain "seems to be at a maximum medical improvement" and that there is "no additional intervention I can recommend." (*Id.*).

On November 23, 2009, Dr. Branovacki noted "essentially no change from [Plaintiff's] last visit." (R. 654). His examination showed "a little bit of effusion and tenderness to palpation" and "[a] lot of hypersensitivity." (*Id.*). Dr. Branovacki opined that Plaintiff "is disabled with his knee both mentally and physically and he cannot really work in a functional capacity at this time" and recommended vocational rehabilitation to train for a new position. (*Id.*). Dr. Branovacki concluded as follows:

> There is not much I can offer him for his knee at this time. He may need knee replacement down the road. I would not recommend any surgery for him for several years to come as this is very emotionally draining for him and he did not recover well from simple arthroscopy despite a complication which was treated appropriately, being infection. He seems to be more concerned about being fired from a new job than actually learning to do the new job and I think emotionally he is not ready to tackle a new job as of yet but I am hoping retraining in something he is interested in might get him back to work and productive. I will release him to modified duty where he can do very limited light desk job type activities pending vocational reassignment and training. I believe he is MMI at this time for his knee and I hope that he can find a job that he is comfortable doing. I will see him again on a prn [*pro re nata* or as needed] basis.

(*Id.*).

### 6.     Denial of Benefits on Reconsideration

On December 7, 2009, Dr. Towfig Arjmand completed a Request for Medical Advice on Reconsideration for the DDS. (R. 616-18). Dr. Arjmand reviewed all the evidence in the file and affirmed Dr. Madala's RFC of July 31, 2009 and the decision denying benefits dated August 6, 2009. (R. 617). Dr. Arjmand incorporated by reference the statement of evidence in the denial of benefits, noting that the additional records submitted upon reconsideration indicate a normal knee exam with no effusion or warmth, good range of motion with tenderness to palpation, and no instability and full range of motion upon exam on September 28, 2009. (R. 618). Plaintiff's application was denied on reconsideration on December 8, 2009. (R. 90-91).

**B.      Plaintiff's Testimony**

In a November 9, 2009 Function Report submitted in support of his application for reconsideration of the denial of benefits, Plaintiff stated that his daily activities consist of taking a shower; going downstairs; making his kids' lunch, feeding them breakfast and sending them off to school; going to the mall with his wife to walk one level and have lunch; cleaning the house "a little;" helping the kids with homework; eating dinner, watching TV, and going to bed.  (R. 233).  He helps feed and groom the pets; prepares food such as frozen pizza, sandwiches, and hot dogs although he has trouble standing for longer than 15 minutes; and "can do some laundry and clean or dust about the house," which he does for "about an hour or two, once a week."  (R. 234-35).  He grocery shops once every two weeks for two hours.  (R. 236).

At the hearing before the ALJ on March 23, 2011, Plaintiff testified that he injured his knee and elbow in March 2008 when he tripped over a pallet at work and fell on the cement.  (R. 48-49).  When he returned to work briefly in 2009, Plaintiff was assigned to do paperwork at a warehouse.  (R. 58).  He testified that he did this job for "a week or two" or "maybe three," although the ALJ noted that Dr. Abusharif indicated he had been back at work for six to eight weeks.  (R. 59).  Plaintiff said that he stopped working when Dr. Branovacki "told me I'm on chronic disability" and "shouldn't be doing the warehouse work I was doing then, you know, because the pain was driving me nuts."  (R. 59-60).  Plaintiff was given "at least a dozen" shots to each knee and they were drained, and "it still didn't help any," so he was put on permanent disability and fired from his job.  (R. 60).

12

Plaintiff testified that he cannot return to work because he cannot sit, stand, or walk for very long; cannot kneel or bend down; has difficulty rising from a chair and walking stairs; and has a "short memory." (R. 60-61). He also said that he has constant, sharp pain in his knees, and that the medication "cuts down [the pain] a little bit, but not all the way," reducing the pain to a 7 out of 10. (R. 61-62). His weight went up from 230 to 310 in the past year. (R. 65). He says he takes "30 pills a day" and "four shots in the stomach" for his pain, diabetes, and other ailments, and his medication has caused memory problems. (R. 62-63). He also hears "ringing in my ears constantly" and has difficulty sleeping. (R. 68, 71-72).

Plaintiff further testified that he takes medication for depression due to his pain, although he could not recall the name of the medication or how long he has taken it, stating "'[o]ne or two years, maybe three." (R. 64-65). Plaintiff said that he's not sure the medication is working since he "want[s] to cry all the time" and is "upset" because the "pain is just killing me." (R. 65). He is "always in a fog" and cannot focus. (R. 73).

In terms of his physical capabilities, Plaintiff testified that he can sit for an hour to an hour and a half; stand for five to ten minutes with his cane but will fall without it; walk for five to ten minutes with his cane; lift a gallon of milk; and has difficulty going up and down stairs, although he does so in his home daily, one step at a time holding the bannister. (R. 54-57). On a typical day his wife will drive him to the mall, where he will "walk a little bit halfway and sit down for about 15-20 minutes, walk the other half, come back, sit there for 20 minutes, and after that we go home." (R. 50). Sometimes he uses a motorized chair at Walmart. (*Id.*). He has used a cane at all times since March 2008,

and can only drive short distances, estimating he drives "maybe 15 minutes a year," due to knee pain. (R. 50-53, 67).

In terms of household activities, Plaintiff reads, helps his children with their homework, sometimes with assistance from his sister, and "sometimes" prepares dinner for the kids although "the only thing I could cook probably is the hot dogs," and other times his wife picks up dinner at McDonald's. (R. 53). He is unable to do any housework or chores and cannot do the shopping, although he can shower on his own, occasionally with assistance from his wife to reach his feet. (R. 54).

**C.    Vocational Expert's Testimony**

Randall Harding testified at the hearing as a vocational expert ("VE"). (R. 74-85). He identified Plaintiff's past relevant work as tractor trailer truck driver and classified it as semi-skilled work at the medium physical demand level that was performed at the medium and heavy levels. (R. 75, 77).

The ALJ then described to the VE a hypothetical individual of Plaintiff's age, education, and work experience who can perform light work consisting of "occasionally lifting 20 [pounds], frequently lifting 10 [pounds], standing or walking at least two hours in an eight-hour work day, [and] sitting about six hours." (R. 77-78). However, pushing and pulling is limited in the right knee consistent with Dr. Madala's assessment, and the individual also cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can frequently balance and stoop; can occasionally kneel, crouch, and crawl; and must avoid concentrated exposure to hazards such as machinery and heights. (R. 78). The VE testified that such an individual would be unable to perform Plaintiff's past

relevant work, but could perform other representative jobs in the Chicago area, including ticket seller (800 positions), cashier (16,000), and router (900).  (R. 79).

The ALJ then presented a second hypothetical restricting the individual to sedentary work, consisting of lifting up to 10 pounds occasionally; standing and walking for less than two hours per work day; sitting for approximately six hours per work day with normal breaks; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs; occasionally balancing with the use of a handheld assistive device (only for uneven terrain, prolonged ambulation, and when standing); occasionally stooping; never crouching, kneeling, or crawling; and avoiding concentrated exposure to hazards such as dangerous machinery and unprotected heights.  (R. 80).  The VE testified that such an individual would be able to perform representative jobs such as addresser (500 positions regionally), document preparer (400), and optical assembler (300).  (R. 80-81).

The ALJ next presented a third hypothetical that maintained the restrictions described in the second hypothetical but added the additional restriction of needing three to four unscheduled bathroom breaks in addition to the standard breaks.  (R. 81). The VE testified that this additional restriction would eliminate all positions.  (*Id.*).

The ALJ next presented a fourth hypothetical that maintained the restrictions described in the second hypothetical but added the additional restriction of needing two unscheduled bathroom breaks in addition to the standard breaks.  (R. 82).  The VE testified that "it would be employer-specific, and it would be length of time required, whether or not it interfered with production and performance," but concluded that the addresser and document prepared jobs would remain, while the optical assembler job

may be eliminated. (*Id.*). The VE also stated that this individual could perform the charge account clerk job (150 jobs regionally). (R. 83).

Lastly, the ALJ presented a fifth hypothetical that maintained the physical restrictions described in the second hypothetical and the unscheduled bathroom breaks required under the fourth hypothetical, but added the additional restrictions that the individual "was moderately limited in concentration such that they require reminders from a supervisor one time a day regarding their tasks" and "they'd be limited to routine and repetitive tasks." (R. 83). The VE testified that the routine and repetitive task restriction would eliminate the charge account clerk job, but that the reminder restriction would not affect the positions he previously identified. (R. 84).

Finally, Plaintiff's attorney asked the VE if the hypothetical individual "is restricted within the sedentary level to certain types of sedentary work," to which the VE responded yes. (R. 85).

## D.    ALJ's Decision

In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of March 18, 2008. (R. 22). At Steps 2 and 3, she determined that Plaintiff's history of bilateral knee arthroscopies, bilateral knee pain, and obesity are severe impairments, but that they do not meet or equal any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23-26). Specifically, the ALJ noted that following bilateral knee surgery in November 2008 and a subsequent infection requiring hospitalization, Plaintiff began outpatient physical therapy in January 2009 and had an "essentially benign" right knee examination in April

16

2009 despite complaining of pain. (R. 24). In June, 2009, a pain specialist started Plaintiff on pain medication and administered a series of injections, and a pain psychologist "surmised that the claimant was demonstrating a high degree of discouragement and identification with the disabled role, a coping style which he noted was difficult to treat." (R. 24-25). By August 2009, Plaintiff had returned to work and the pain specialist reported that his symptoms were well-controlled on his current medication. (R. 25). By September 2009, the pain psychologist reported that Plaintiff was on light duty and had increased his overall work tolerance, and in early October 2009 Plaintiff told the pain specialist that his medications resulted in better control and he was tolerating work without any significant flare-ups. (*Id.*). Although Plaintiff complained of right knee pain to his orthopedic surgeon in late November 2009, his physical examination remained unchanged, showing "slight effusion and tenderness to palpitation and a lot of hypersensitivity." (R. 25-26).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform sedentary work except that he can only occasionally push or pull with the right upper extremity; can never climb ladders, ropes, or scaffolds but can occasionally climb ramps or stairs; can occasionally balance with the use of a hand held assistive device; can occasionally stoop but can never crouch, kneel, or crawl; must be allowed to use a hand held assistive device for uneven terrain, prolonged ambulation, and at all times when standing; and must avoid concentrated exposure to dangerous machinery and unprotected heights. (R. 26). In addition, the ALJ specified that Plaintiff "has moderate limitations in concentration and needs reminders from supervisors regarding work tasks approximately once a day" and "is

also limited to work consisting of routine and limited tasks." (*Id.*). Finally, the ALJ found that Plaintiff "requires unscheduled breaks in addition to a regular lunch period and two normal breaks." (R. 27).

The ALJ then found that Plaintiff is unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the Chicago region that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 30-31). Accordingly, the ALJ found that Plaintiff was not disabled since his alleged disability onset date. (R. 31).

## DISCUSSION

### A.    Disability Standard

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when his disability arose, is entitled to Disability Insurance Benefits. 42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A). An individual is under a disability if he is unable to do his prior work and cannot, given his age, education, and work experience, engage in any gainful employment existing in the national economy. *Id.* at § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or

equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

**B.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. 42 U.S.C. § 405(g). A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'" *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1).

## C.    Analysis

The Court now addresses in turn each of Plaintiff's arguments challenging the ALJ's decision.

### 1.    Determination of Severe Impairments at Step 2

Plaintiff first argues that the ALJ's determination is flawed because she failed to consider all of his significant impairments at Step 2 of the sequential analysis.  An ALJ "is required to determine at step two of the sequential analysis whether the claimant in fact has an impairment or combination of impairments that is 'severe.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (citing 20 C.F.R. § 404.1520(a)(4)(ii)).  "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'"  *Castile*, 617 F.3d at 926 (citing 20 C.F.R. § 404.1520(c)).  The severity finding at Step 2 is merely a threshold finding, and thus if an ALJ finds that one or more impairments are severe, the ALJ must then at Step 3 "consider the aggregate effect of this entire constellation of ailments – including those impairments that in isolation are not severe."  *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. § 404.1523); *see also Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).  The burden is on the claimant at Step 2 to show severity.  *Castile*, 617 F.3d at 926-27.

Here, the ALJ did all that was required of her.  She concluded at Step 2 that Plaintiff has the severe impairments of status post bilateral knee arthroscopies, bilateral knee pain, and obesity.  (R. 23).  Having made this threshold finding, the ALJ went on to consider these severe impairments in determining Plaintiff's RFC (R. 27-28), as well as considering additional impairments, namely urinary frequency due to diuretics and

difficulty concentrating due to a combination of medication, pain, and ringing in his ears. (R. 28-29).  Plaintiff argues that the ALJ's Step 2 determination is incomplete because the ALJ only "states the impairment of the knee as knee pain and status post bilateral knee arthroscopies when in reality the knees had bilateral knee derangement, torn meniscus, contusion of the olecranon [elbow] and triceps tendonitis, right knee MCL sprain, chondromalacia of the patellofemoral compartment, MRSA, and septic arthritis." (Doc. 22-1 at 12).  As an initial matter, the ALJ's decision clearly demonstrates that all of these conditions, apart from the elbow problem, are encompassed by the ALJ's finding concerning Plaintiff's knee pain and status post-arthroscopies, and the medical evidence makes clear that the elbow problem was resolved.  But even assuming *arguendo* that Plaintiff is correct that the ALJ omitted certain conditions, he fails to explain how this matters given that the ALJ found three severe impairments and continued on in the sequential analysis.

Plaintiff also asserts that the ALJ at Step 2 should have considered evidence of deep vein thrombosis, hearing loss, high cholesterol, and dyslipidemia." (*Id.*).  It was Plaintiff's burden at Step 2 to show that these impairments are severe and the evidence does not support such a conclusion.  But again, even if Plaintiff could make this showing, he cannot demonstrate any harm because Step 2 is simply a threshold finding, and here the ALJ found severe impairments at Step 2 and then progressed to Step 3 based on other severe impairments she identified.  Thus, any error at Step 2 was harmless.

### 2. Opinion of Treating Physician Dr. Branovacki

Plaintiff next argues that the ALJ mischaracterized and failed to give adequate weight to the opinion of treating physician Dr. Branovacki. A treating physician's opinion is entitled to controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio*, 630 F.3d at 710; *Schaaf*, 602 F.3d at 875; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Plaintiff makes two arguments concerning Dr. Branovacki's opinion. First, he contends that the ALJ erred by giving no weight to Dr. Branovacki's November 23, 2009 treatment notes restricting him to "limited light desk type job activities." (Doc. 22-1 at 13-14). But Plaintiff misstates the ALJ's finding. The ALJ did not decline to give *any* weight to the opinion; rather she concluded as follows:

> The undersigned also affords *some* weight to Dr. Branovacki's November 23, 2009 opinion indicating that the claimant was released to modified duty where he would be able to do a limited light desk job pending vocational reassignment and training. (Exhibit 16F). However, to the extent that Dr. Branovacki noted that the claimant was disabled, this particular finding is entitled to no weight as the ultimate issue of disability is reserved to the Commissioners (20 CFR 1527(e)(1)).

(R. 29, citing R. 654) (emphasis added). Plaintiff also asserts, "By its own terms, this is not consistent with light work, either full-time or competitive employment, and is more restrictive than his previous release." (Doc. 22-1 at 13-14). However, Plaintiff fails to

explain how Dr. Branovacki's statement that Plaintiff can do "a limited light desk job pending vocational reassignment and training" is at all inconsistent with the ability to do competitive or full-time light work, or why it matters how restrictive this opinion is in comparison to prior opinions. Nor does Plaintiff explain how Dr. Branovacki's statement is inconsistent with the ALJ's RFC finding that Plaintiff is limited to sedentary work. To the extent Plaintiff argues that the November 23 opinion "took him off work completely" (Doc. 22-1 at 13), Dr. Branovacki's statement on its face simply does not support such a conclusion given that he expressly "release[s] him to modified duty" as the ALJ described. (R. 654). In any event, as the ALJ correctly observed, no weight need be given to a physician's opinion that a claimant is disabled or unable to work as that determination is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1).

Plaintiff's second argument concerning Dr. Branovacki is more difficult to decipher. Plaintiff simply states, "The ALJ did not consider the relationship between Dr. Branovacki's very restricted release from March, 2009, in connection with his subsequent opinion that he was 100% disabled." (Doc. 22-1 at 14). Plaintiff asserts that the ALJ "did not give any consideration to this report and did not even indicate she was aware of the report." (*Id.*). The "report" that Plaintiff appears to reference, but does not describe, is one of approximately twenty "work status" forms submitted by Dr. Branovacki in connection with Plaintiff's workers' compensation claim between October 2008 and September 2009. (R. 591-611). The March 9, 2009 work status form specifies that Plaintiff can return to work on modified duty on March 11, 2009 as follows: "Desk job only with breaks every 2 hours (10 minutes)[.] Start 4 hours per day x5 days a week x3 wks[.] Then 8 hours per day x 1 wk. Start 3/11/09." (R. 600). Plaintiff argues

that these limitations are "very restricted" and that the ALJ erred by not concluding as much, however his brief is devoid of any support for this conclusion when, in fact, the work status form specifies that Plaintiff can return to work in two days and will reach full-time sedentary capability within three weeks.  Likewise, Plaintiff fails to explain how this opinion is markedly inconsistent with Dr. Branovacki's November 23, 2009 opinion that Plaintiff can perform "a limited light desk job" pending vocational retraining.  (R. 654).  Plaintiff also does not discuss any of the medical evidence or opinions in the nearly 9 months between the March 9, 2009 work status report and the November 23. 2009 treatment notes.

In sum, Plaintiff's contention that Dr. Branovacki found him to be entirely disabled and unable to work is not supported by the very evidence cited by Plaintiff.  Even if Dr. Branovacki had made such findings, a treating doctor's opinion about whether a claimant is disabled is not entitled to controlling weight.  Accordingly, Plaintiff fails to demonstrate that the ALJ disregarded, mischaracterized or failed to accord sufficient weight to Dr. Branovacki's opinions.

### 3.    Credibility Finding

Plaintiff next argues that the ALJ's credibility determination was improper.  An ALJ's credibility finding is accorded deference and may be overturned only if it is "patently wrong."  *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)).  However, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record," *Pepper*, 712 F.3d at 367 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)), and must connect credibility determinations to the record evidence by an "'accurate and logical

bridge,'" *Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).   For the reasons discussed below, the ALJ's credibility determination is supported by substantial evidence.

After considering Plaintiff's testimony concerning his pain, mental impairments, and activities of daily living, the ALJ concluded that "more weight is given to the treatment records than to the claimant's testimony."  (R. 28).   While the ALJ noted the significant amount of evidence pertaining to Plaintiff's knee surgery and subsequent hospitalization for a staph infection, she afforded greater weight to the treatment records than to Plaintiff's testimony because: the physical examination findings were largely normal; neither Dr. Abusharif nor Dr. Branovacki indicated that Plaintiff was a candidate for additional surgery or required continued care; and the pain psychologist opined that Plaintiff was not as active in his recovery process as he should have been "which was a psychological impediment to his overall functioning ability and return to work status." (*Id.*).   The ALJ further observed that treatment for the alleged impairments had been "essentially non-existent" since November 2009 which coincided with when Plaintiff completed a Function Report in which he indicated that his activities of daily living were "much broader" than they were when he testified at the hearing.  The ALJ reasoned that "[b]y implication, [Plaintiff's] overall condition would have deteriorated to correspond to his decreased functioning.   Nevertheless, [Plaintiff] did not seek additional medical treatment, which is inconsistent with a finding that his conditional actually worsened." (*Id.*).   As for the alleged side effects of medications (urinary frequency and difficulty concentrating), the ALJ noted that the "record does not reflect serious adverse pharmacology related side effects impairing his capacity to perform basic work tasks."

25

(R. 29). Finally, the ALJ relied on the fact that Dr. Branovacki and Dr. Abusharif opined in July and September 2009, respectively, that Plaintiff was able to return to sedentary work. (R. 28-29).

### a.  Daily Activities

While Plaintiff's arguments are not fully developed, he appears to argue first that his daily activities establish he is unable to work. The ALJ considered and summarized Plaintiff's testimony regarding his pain and physical limitations, including that he uses a cane at all times, can sit for an hour and a half and stand for 10-15 minutes, has problems climbing stairs, and is able to lift a gallon of milk. (R. 27). The ALJ also recounted Plaintiff's testimony about his daily activities, including that he provides childcare when his wife is at work in the evenings, occasionally prepares meals for his children, helps them with homework, and reads and spends time with his family. (R. 28). However, the ALJ concluded in her decision that the largely normal medical examinations do not support Plaintiff's statements about the extent of his limitations, including that he "essentially regained full range of motion in both of his knees" and his "neurological functions in terms of motor power, reflex activity and sensation were intact, and his musculoskeletal and extremity reviews were free of deformity, clubbing, cyanosis, edema, heat, discoloration, ulceration, diminished pulsation or atrophic changes." (*Id.*). She also observed that the Function Report, which Plaintiff completed in November 2009, "indicates that the claimant's activities of daily living were much broader than those he testified to at the hearing." (*Id.*).

Plaintiff does not identify with any specificity what evidence the ALJ failed to consider concerning daily activities, nor does he explain why he believes the ALJ's

determination to be deficient. Plaintiff merely asserts that the ALJ failed to give examples of inconsistencies between what Plaintiff said in the Function Report and during the hearing, and "[o]ur review indicates that the Function Report is consistent with his testimony." (Doc. 22-1 at 16). To the contrary, the ALJ noted that Plaintiff testified to relying on his wife for assistance with showering, while the Function Report specified no problems with personal care including bathing. (R. 28, citing R. 234). Other inconsistencies are also apparent. For example, Plaintiff testified at the hearing that he is unable to do housework or chores at home (R. 54), yet in his Function Report he states that he feeds and brushes the pets and "can do some laundry and clean or dust around the house" for "about an hour or two, once a week." (R. 234-35). As for cooking, Plaintiff testified that he is limited to making hot dogs, while the Function Report specifies that he "make[s] the kids sandwiches, feed[s] them breakfast" and prepares "frozen pizza, ham sandwiches and hot dogs[,] also peanut butter and jelly sandwiches" and that he does so once every other day for about 15 minutes. (R. 233, 235).

In sum, Plaintiff's conclusory statement that the ALJ did not adequately consider his daily activities in assessing his credibility is insufficient to show that the credibility determination is flawed, let alone patently wrong.

### b. Severity of Pain

Plaintiff next argues generally that his pain is more severe and limiting than the ALJ found it to be. In assessing a claimant's credibility when the allegedly disabling symptoms, such as pain, are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, 1996

WL 374186, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila*, 573 F.3d at 517 (quoting 20 C.F.R. § 404.1529(c)(2)-(4)).

Here, the ALJ did exactly that. In addition to the daily activities and objective medical evidence discussed above, the ALJ relied on the opinions of Dr. Branovacki and Dr. Abusharif that Plaintiff was not a candidate for additional surgery nor did he require continued care. (R. 28). She also relied on pain psychologist Dr. Brown, who "indicated that the clamant was not nearly as active [in] his recovery process as he should have been, which was a psychological impediment to his overall functioning ability and return to work status." (*Id.*). Furthermore, she observed that Plaintiff did not seek additional treatment, "which is inconsistent with a finding that his condition actually worsened." (*Id.*). Plaintiff again provides no legal or factual basis for rejecting the ALJ's finding as to Plaintiff's credibility concerning his pain.

### c. Inactivity in Recovery Process

Plaintiff next complains that the ALJ put the "cart before the horse" when she relied (in part) on Dr. Brown's statement – that Plaintiff was not "was not nearly as active [in] his recovery process as he should have been" – to support the finding that Plaintiff's limitations were not as severe as he testified. (R. 28). Plaintiff argues that the

ALJ "failed to consider that Dr. Brown emphasized he is not purposefully resisting treatment, and attributed his mind set that [sic] if his doctors cannot fix him, he must accept that his condition is as good as it will get, to his coping style and mental impairments." (Doc. 22-1 at 16). Again, Plaintiff's undeveloped argument is difficult to comprehend. The ALJ in no way mischaracterized Dr. Brown's statements and expressly noted that Dr. Brown found the lack of participation in the recovery process to be a "psychological impediment" to Plaintiff's "overall functioning ability and return to work status." (R. 28). Since Plaintiff fails to explain why it was patently wrong for the ALJ to rely on Dr. Brown's findings in this regard when evaluating the extent of Plaintiff's limitations, the argument is rejected.

### d.    Lack of Treatment After November 2009

Finally Plaintiff asserts that the ALJ erred in considering his failure to pursue medical treatment since November 2009 given that his doctors advised him that he had reached maximum medical improvement and that no further treatment would benefit him. (Doc. 22-1 at 16). A claimant's lack of treatment may support an adverse credibility finding, *Nicholson v. Astrue*, 341 F. App'x 248, 252 (7th Cir. 2009), but an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," SSR 96-7p, 1996 WL 374186, at *7. Here, Plaintiff offered no such explanations at his hearing, such as inability to pay or side effects so severe that he was unable to take his medication. And the ALJ identified other evidence in the record

that supports the conclusion that Plaintiff failed to seek treatment after November 2009 because he was exaggerating his pain (as evidenced by his hearing testimony contradicting his Function Report) and was uninterested in participating in his own treatment (as opined by pain psychologist Dr. Brown). (R. 28). Plaintiff points to no contrary evidence, nor does he now offer an explanation for failing to return to a doctor in the nearly 16 months preceding his hearing, during which time he claimed to be suffering excruciating and totally debilitating pain.

For these reasons, Plaintiff has failed to demonstrate that the ALJ's credibility finding was patently wrong.

### 4. RFC Assessment

Plaintiff next argues that the ALJ erred by not presenting hypotheticals to the VE that impose more severe restrictions on lifting, standing, and repetitive motions, as well as non-exertional and mental limitations. Upon closer examination, the argument challenges the ALJ's determination as to Plaintiff's limitations, and on that basis argues that the hypotheticals do not accurately reflect Plaintiff's RFC. Accordingly, the Court construes this argument as a challenge to the RFC determination, and finds the argument to lack merit.

In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work or adjust to other work, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations. 20 C.F.R. §§ 404.1520(e), 404.1545; SSR 96–8p, 1996 WL 374184, *2. The RFC determination is a legal, rather than a medical, one. 20 C.F.R. § 404.1527(d). In crafting the RFC, an ALJ must consider all functional limitations and restrictions that

stem from medically determinable impairments, including those that are not severe. *See* SSR 96–8p, 1996 WL 374184, *5. An ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority in the record. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Clifford*, 227 F.3d at 870. But an ALJ need not discuss every piece of evidence, and need only logically connect the evidence to the ALJ's conclusions. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.

Here again, Plaintiff relies on conclusory statements, merely reiterating his own subjective symptoms without in any way demonstrating that they are supported by the objective or opinion evidence in the record. First, Plaintiff argues that it is disputed whether he can lift 5 pounds or 10 pounds, how long he can stand, and the effect of his pushing/pulling limitations on his ability to do "repetitive motion." (Doc. 22-1 at 17). What Plaintiff fails to grasp is that to the extent these limitations were in dispute, they were resolved by the ALJ when she made her RFC finding based on the Plaintiff's testimony and the record evidence. If Plaintiff now wishes to challenge that finding, he must demonstrate that the finding is not supported by substantial evidence. Plaintiff's list of "disputes" sheds no light on the evidentiary support, if any, for more restrictive limitations on lifting, standing, or repetitive motion.

Plaintiff also contends that the ALJ erred by not adequately considering his non-exertional limitations, namely not determining: how many breaks he needs due to urinary frequency problems; how many reminders he needs to address his memory problems; and the extent of his pain on his cognitive function. (Doc. 22-1 at 17). But the ALJ incorporated these limitations into the RFC and the hypotheticals posed to the

VE, by requiring two unscheduled breaks in addition to lunch and two normal breaks and by accounting for his moderate limitations in concentration due to pain by requiring once daily reminders from supervisors and limiting him to routine and limited tasks. (R. 26-27). The VE testified that even with these limitations, there were jobs that Plaintiff could perform. (R. 83-84). Again, Plaintiff fails to identify any evidence that contradicts these RFC findings or supports more restrictive ones.

Plaintiff next argues that the ALJ did not adequately account for his moderate limitations in concentration, persistence or pace, and directs the Court to *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009), which held that limiting an individual to simple, routine tasks is not sufficient to account for deficiencies in concentration, persistence or pace. *Id.* at 684-85. But limiting Plaintiff to "routine and limited tasks" is not the only way in which the ALJ accounted for Plaintiff's moderate concentration limitations; rather she first specified that "[d]ue to pain, the claimant has moderate limitations in concentration and needs reminders from supervisors regarding work tasks approximately once a day." (R. 26). Plaintiff makes no argument that these limitations together are insufficient to address his moderate concentration difficulties, nor does he identify any evidence to suggest that greater limitations are called for.

Plaintiff next argues that the ALJ erred by not requiring a psychological consultative exam or mental RFC assessment concerning his depression. (Doc. 22-1 at 18). Plaintiff cites no legal authority that a consultative exam or MRFC was required here, where Plaintiff never claimed to be disabled by a mental impairment, but rather only mentioned depression as a symptom of his pain. *See Richards v. Astrue*, 370 F. Appx. 727, 730-31 (7th Cir. 2010) (citing 20 C.F.R. § 404.1520a(e)(1)). In any event,

the ALJ adequately accounted for Plaintiff's depression symptoms in her decision even though the record contains no medical evidence of depression. The ALJ heard Plaintiff's testimony that he is depressed due to pain and takes pills for depression, although he could not recall the type of medication, the dosage, or the period of time during which he had been taking it. (R. 64-65). The ALJ acknowledged in her decision Plaintiff's testimony "that he was depressed and feels as if he frequently wants to cry and is unable to think for himself." (R. 27-28). The ALJ also considered progress notes from Plaintiff's primary care physician, Dr. Chaden Sbai, dated August 13, 2010 that indicate Plaintiff is "going to see [a] psychologist," while also noting that Plaintiff "feels better." (R. 26, citing R. 656). Thus, the ALJ adequately considered Plaintiff's very limited evidence of depression in assessing his RFC.

Finally, Plaintiff asserts that the ALJ "says she gave great weight to the physical RFC prepared by Dr. Madala, a State Agency Consultant (R. 492), but disregards the written statement that his knee has reached maximal benefit and he requires assistance with ambulation (R. 493)." (Doc. 22-1 at 15.) Specifically, Plaintiff provides a list of "findings" from Dr. Madala's assessment that he argues the ALJ ignored. (*Id.*). But Dr. Madala's report makes clear that those symptoms are merely a recounting of Plaintiff's subjective complaints, *not* Dr. Madala's objective findings. (R. 497). Later in her assessment, Dr. Madala found Plaintiff's statements to be "partially credible in light of the overall evidence," but concluded that his stated functional limitations exceed those supported by the objective medical findings. (R. 499). Thus, the ALJ did not err in declining to consider Plaintiff's subjective complaints to the extent Dr. Madala found them not credible.

Accordingly, the RFC determination is supported by substantial evidence and will not be disturbed.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 22] is denied and Defendant's Motion for Summary Judgment [Doc. 30] is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: December 30, 2013

_____

SHEILA FINNEGAN
United States Magistrate Judge